## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO

*Electronically Filed*

| | | |
|---|---|---|
| **JENNIFER TEETS,** | ) | |
| **825 DEERVALLEY DR** | ) | |
| **CINCINNATI, OH 45245** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **CASE NO. _____** |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **E.W. SCRIPPS COMPANY,** | ) | **COMPLAINT** |
| **312 WALNUT ST SUITE 2800** | ) | **WITH JURY DEMAND** |
| **CINCINNATI, OH 45202** | ) | |
| **SERVE:** | ) | |
| **CORPRATION SERVICE AGENCY** | ) | |
| **3366 RIVERSIDE DR #103** | ) | |
| **UPPER ARLINGTON, OH 43221** | ) | |
| | ) | |
| **DEFENDANT** | ) | |

For her complaint against the Defendant E.W. Scripps Company, Plaintiff Jennifer Teets alleges and avers as follows:

1. Throughout the Covid-19 pandemic, the Plaintiff, Jennifer Teets stood ready, willing, and able to take safety precautions in the workplace as required by her past employer, even when that workplace was her own home, to prevent the spread of Covid-19 and protect her health and the health of those employees with whom she worked. The Plaintiff, however, has a religious belief that conflicts with one of her past employer's safety policies: mandatory vaccination. The Plaintiff's conflict is protected by federal and state law. Thus, this case is not a challenge to the lawfulness of the stated policy held by the Defendant, but rather

how that policy was implemented, an attempt to prevent unlawful discrimination based on religion in the future, and to hold her past employer accountable for the harm she has suffered at its hands.

2.      Federal and state law recognize an employee has a right to have religious beliefs considered when those beliefs conflict with an employer's policies, and, when possible, accommodated. The Defendant E.W. Scripps Company ignored federal and state law and instead applied its own set of rules when it comes to religious accommodations and exemptions to its mandatory Covid-19 vaccination policy. Defendant then wrongfully denied Plaintiff's request by arbitrarily determining the veracity of Ms. Teets' sincere religious beliefs. This was done in violation of Defendant's obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and Section 4112.02 of the Ohio Revised Code ("O.R.C. § 4112.02").

3.      Defendant's actions left Ms. Teets with the impossible choice of either taking the Covid-19 vaccine, at the expense of her religious beliefs or losing her livelihood.

4.      Under Title VII and Ohio law, if an employee seeks a religious accommodation, the employee's employer cannot summarily impose employer-preferred workplace rules that abridge an employee's sincerely held religious beliefs without genuine, good-faith dialogue and consideration of proposed accommodations with objective evidence, and, if the employer chooses to deny an employee accommodation request, proof that allowing the accommodation would place an undue burden on the employer. The conduct of the E.W. Scripps Company was in violation of these laws.

## **PARTIES**

5.      The Plaintiff, Jennifer Teets, ("Plaintiff" or "Ms. Teets") is a resident of

Cincinnati, Ohio. The Plaintiff has been employed by the Defendant E.W. Scripps Company ("Defendant") for over 20 years.

6.      The Plaintiff worked 100% remotely for the Defendant after the advent of Covid-19. Moreover, the Defendant and the Plaintiff intended her position to remain remote moving forward. Upon information and belief, the Defendant, advertising for the Plaintiff's replacement, states the job will be 100% remote with 0% travel.

7.      The Plaintiff has a sincere religious belief that taking a Covid-19 vaccine violates her religious beliefs. The Plaintiff requested a religious accommodation from the Defendant's vaccine mandate policy ("vaccine mandate"), issued on September 9, 2021 (attached hereto as **Exhibit A**), which required all employees, even those working 100% remotely, to be fully vaccinated against Covid-19, by December 1, 2021. The Defendant further stated in **Exhibit A** that the Defendant "understood some employees may have a medical reason or sincerely held religious belief for not getting the vaccine, and we will have an accommodation process for those employees." *Id.*

8.      The Plaintiff followed all the Defendant's procedures to apply for a religious exemption to the Defendant's vaccine mandate to which she was legally entitled, and the Defendant wrongfully and improperly denied the Plaintiff's request and terminated her employment.  The termination was effective on December 1, 2021.

9.      The Defendant is incorporated in the State of Ohio, with its principal place of business at 312 Walnut St., Suite 2800, Cincinnati, Ohio 45202.  Actual direction, control and coordination of the Defendant's business occurs in Cincinnati, Ohio.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331

because the Complaint seeks relief and damages under federal statute, 42 U.S.C. § 2000e, *et seq.,* and has supplemental jurisdiction over the Plaintiff's state law claim arising from the same events and occurrences under O.R.C. § 4112.02 pursuant to 42 U.S.C. § 1367.

11.     Venue is proper in this district pursuant to U.S.C. § 1391(b) because the relevant events took place in Cincinnati, Ohio, which is in the Southern District of Ohio, Western Division and the Defendant's principal place of business is located therein.

12.     The Court has personal jurisdiction over the Defendant because the Defendant resides and conducts business in this judicial circuit.

13.     Plaintiff's claims for attorney's fees and costs are predicated upon Title VII, 42 U.S.C. § 2000e-5, and as allowed under state law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.     On December 30, 2021, Plaintiff timely filed charges of religious discrimination with the Ohio Civil Rights Commission ("OCRC"). OCRC has a dual filing agreement with the Equal Employment Opportunity Commission ("EEOC").

15.     Her Notice of Right to Sue was issued on September 16, 2022. *See* **Exhibit B**.

16.     This Complaint is being timely filed based on the date Plaintiff received her Notice to Right to Sue.

17.     All administrative prerequisites to the filing of this suit have been meet.

## ALLEGATIONS

18.     In March 2020, American life was irreparably changed both by Covid-19 and by various governments and employers' response to it. Covid-19 is a virus that was first detected in Wuhan, China, and eventually made its way to the United States of America, setting

4

off a chain of events that has irretrievably changed the day-to-day life of many, if not most, Americans.

19.     In the spring of 2020, the Defendant began implementing procedures for its workforce, including several of the following requirements for its employees: masks, social distancing, temperature checks, Covid-19 testing, self-quarantine, and working from home. Upon information and belief, the Defendant had substantial success reducing the risk of Covid-19 spread through these efforts.

20.     Despite the Defendant's success in controlling the spread of Covid-19 in its workspace, the Defendant chose to implement a blanket vaccine mandate, based on reasoning unsupported by science, and has improperly implemented its vaccine mandate in violation of Title VII and O.R.C. § 4112.02.

21.     Furthermore, the Defendant improperly terminated the Plaintiff for refusing to comply with one of its safety procedures – mandated vaccination – which has limited results in preventing the transmission of disease in the workplace, ignores natural immunity, and improperly assesses risk. All of this was done without proper consideration of Plaintiff's rights and an analysis of her requested accommodation in the face of her sincerely held religious beliefs and whether the accommodation would be an undue burden on the Defendant, which is required under Title VII and state law.

**The Defendant pivoted from successful and proven Covid-19 mitigation practices and improperly chose mandated vaccination as its sole safety procedure upon which it predicated employment.**

A. The vaccine mandate is unlawful as enforced.

22.     The Food and Drug Administration ("FDA") issued an Emergency Use

Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020 for select populations. One week later a second EUA for the Moderna Covid-19 vaccine was issued. The FDA issued an EUA for the Johnson & Johnson Covid-19 vaccine on February 27, 2021. On August 23, 2021, the FDA issued full approval for the Pfizer-BioNTech Covid-19 vaccine marketed as Comirnaty. However, it should be noted, that the FDA has admitted the Comirnaty vaccine, which is legally distinct from the Pfizer vaccine that is currently available in the UK, has never been available in the US. On January 31, 2022, the FDA announced its approval of the Moderna Covid-19 vaccine, to be marked as Spikevax, which has the same formulation as the EUA-approved Moderna vaccine.[1]

23.    Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines widely available for use in the United States are these three experimental, investigative and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses.

24.    Since the rollout of the vaccines, more and more data increasingly show the vaccines do not prevent infection, do not prevent transmission, and do not prevent illness. Indeed, countries with the most aggressive, expansive use of the vaccines have seen record-setting infection rates and continuing high illness rates.

25.    Scientists studying over 4,000 frontline workers found that between

_____

[1] FDA, *Spikevax and Moderna COVID-19 Vaccine* (Jan. 31, 2022) available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/spikevax-and-moderna-covid-19-vaccine.

December 2020 until April 2021, the effectiveness of the vaccines cratered from 91 percent to 66 percent. This drastic decline occurred before the Delta and Omicron variants became dominant variants.[2]

26.    Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020, until August 8, 2021, the vaccine plummeted in effectiveness, collapsing from 88 percent to 47 percent.[3]

27.    In addition, governmental authorities have revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients "vaccines" because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which these vaccines can any longer claim credit for – this reflects the fact there has never been a successful Covid-19 vaccine in history due to the viral evolution each virus mutates into.[4]

B.    The vaccine mandate ignores natural immunity.

28.    The National Institutes of Health and other bodies have found that natural immunity to Covid-19 – that is, immunity cause by infection with Covid-19 and recovery – is incredibly strong. Specifically, antibodies against the spike protein of the Covid-19 virus remain in 98% of people who have recovered from the virus six to eight months after infection (and the

---

[2] Ashely Fowlkes, et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020-August 2021,* 70 Morbidity and Mortality Weekly Report (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.com.
[3] Sara Y. Tartof, et al., *Six-month Effectiveness of BNT162b2mRNA COVID-19 Vaccine in a Large US Integrated Health System: A Retrospective Cohost Study,* Lancet, 2021 Oct. 16, 398 (10309):1407-16, available at https://pubmed.ncbi.nlm.nih.gov/34619098/.
[4] Katie Carrero, *Why did the CDC change its definition for 'vaccine'? Agency explains more as skeptics lurk,* MIAMI HERALD (Sept. 27, 2021) available at https://wwww.miamiherald.com/news/coronavirus/artcle254111268.html.

outer limit of the study was simply because the study was done on individuals where were six to eight months out of recovery, not because immunity begins to wear off).[5]

29.     Health and Human Services' Assistant Secretary, Dr. Admiral Brett Giroir stated in August 2021, in a nationally televised interview, that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective."[6]

30.     The data out of the State of Israel underscores this point. In a paper awaiting peer review, scientists out the State of Israel report that in studying thousands of patients, those whose only source of immunity was a vaccine (in the case of Israel, the Pfizer vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of Covid-19 over those whose immunity was natural.[7]

31.     Israel is one of the most vaccinated places in the world, with close to 80% of the country having been vaccinated. Israel's bout with the Delta variant of Covid-19 has demonstrated that the Pfizer vaccine, once considered the Cadillac of the three Covid-19 vaccines, is only 64% effective at preventing symptomatic cases of Covid-19.[8] Moreover, despite Israel's high vaccination rates, Israel is becoming "the world's COVID hotspot."[9]

---

[5] NIH, *Lasting Immunity Found After Recovery from COVID-19*, NIH (Jan. 26, 2021), available at https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19.

[6] FOX NEWS, *Admiral Brett Giroir explains natural immunity to COVID-19*, Admiral Brett Giroir (Aug. 13, 2021) available at https://www.youtube.com/watch?v=O641EW4okPs.
[7] Sivan Gazit, et al., *Comparing SARS-CoV-2 Natural Immunity to Vaccine -Induced Immunity: Reinfections Versus Breakthrough Infections*, medRvix (Aug. 25, 2021), available at https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf.
[8] Aaron Blake, *Vaccine doubters' strange fixation with Israel*, WASHINGTON POST (Jul. 22, 2021) available at https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reasons/.
[9] Conor Boyd, *Israel is not the world's Covid hot spot: Cases sours despite country's trail blazing vaccine roll-out – sparking fears other highly-vaccinated countries will be hit by another wave due to jabs' waning immunity*, DAILY MAIL (Sept. 3, 2021) available at

32.    In addition, in a study concerning the Omicron variant, scientists found that the variant "can evade immunity from COVID-19 more so than any other previous variants discovered during the course of the pandemic."[10] "Researchers studied over 11,000 Danish households and found that those who had the Omicron variant had a 31 percent chance of a secondary attack rate (SAR), which refers to the probability an infection occurs within a specific group like a household or close contacts."[11] Moreover, the study revealed that "vaccine effectiveness was reduced to around 40 percent against symptoms and to 80 percent against severe disease. . ."[12]

33.    The now well-known study of the effects of natural immunity in the Cleveland Clinic Health System provides yet another example of the real-world superiority of natural immunity to vaccine immunity. That study compared "breakthrough infections" (re-infection after either contracting Covid-19 or taking a vaccine) among employees of the Cleveland Clinic Health System and found that those who were previously infected and unvaccinated, 1359 people, none suffered breakthrough infections. [13]

34.    Another published study found that there is "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases in the last [seven] days."[14]

---

[10] Shirin Ali, *New study finds omicron variant better at evading immunity*, THE HILL (Jan. 3, 2021) available at https://thehill.com/changing-america/well-being/prevention-cures/588040-new-study-finds-omicron-variant-better-at citing and referencing https://www.medrxiv.org/content/10.1101/2021.12.27.21268278v1.

[11] *Id.*

[12] *Id.*

[13] Nabin K. Shrestha, et al., *Necessity of COVID-19 Vaccine in Previously Infected Individuals*, medRxiv (Jun. 19, 2021), available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.

[14] S.V. Subramanian and Aknil Kumar, *Increases in COVID-19 are Unrelated to Levels of Vaccination Across 68 Countries and 2947 Counties in the United States,* Eur J Epidemiol 2021

https://dailymail.co.uk/news/article-9951117/Isreal-worlds-covid-hotspot-0-2-population-catching-yesterday.html.

The study found to the contrary that there was a "marginally positive association such that countries with higher percentage of population fully vaccinated have higher COVID-19 cases per [one] million people."[15] That study, which analyzed 68 different countries' vaccination rates and the rate of new Covid-19 cases, specifically referred to Israel, Portugal and Iceland, each of which is highly vaccinated and which had more cases per one million people than, for example, Vietnam and South Africa, which had around ten percent of their population fully vaccinated.[16]

35.    Several scholarly journals have also weighed in on the superiority of natural immunity to vaccine immunity.[17] Further, those who previously were infected with Covid-19 were at greater risk for bad side effects associated with the vaccine - in such cases, the vaccine might even weaken their pre-existing immunity.[18]

36.    While the vaccines have had some effectiveness at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of Covid-19, and, therefore, transmission of Covid-19.

C.    The vaccine mandate relies on an improper assumption about the infection-fatality rate and asymptomatic spread.

37.    Covid-19 presents a risk primarily to individuals aged 85 or older [19] and

---

Sep 30:1-4, https://doi.org/10.1007/s10654-021-00808-7, available at https://link.springer.com/article/10.1007/s10654-021-00808-7.

[15] *Id.*

[16] *See id.*

[17] Jackson S. Turner, et al., *SARS-CoV-2 Infection Indicates Long-lived Bone Marrow Plasma Cells in Humans*, NATURE, 595, 421-25 (May 24, 2021), available at https://www.nature.com/articles/s41586-021-03647-4.

[18] Carmen Camara, et al., *Differential Effects of the Second SARS-CoV-2 mRNA Vaccine Dose on T Cell Immunity in Naïve and COVID-19 Recovered Individuals*, bioRxiv (Mar. 22, 2021) https://doi.org/10.1101/2021.03.22.436441, available at https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1.

[19] Mayo Clinic, *COVID-19: who's at higher risk of serious symptoms* (Jan. 22, 2022) available at: https://www.mayoclinic.org/diseases-conditions.

10

those with comorbidities such as hypertension and diabetes.[20]

38.     The majority of deaths associated with Covid-19 occur in those over the age of 55.[21] Within the most heavily impacted age group (age 85 and up), only 13.3% of deaths from February 2020 to February 2021 were attributed to Covid-19.[22]

39.     One of the most useful measures for calculating the risk of dying from a virus is the infection-fatality rate ("IFR"). The IFR is calculated by dividing the number of Covid-19 deaths by the number of Covid-19 infections. It attempts to answer the critical question: "If I get sick, what is the chance that I will die?" The Center for Disease Control and Prevention ("CDC") estimates the IFR for the bulk of most working-age adults is exceedingly low.[23] For adults under age 50, the CDC's "current-best estimate" is that 500 people will die per 1,000,000 infections nationwide.[24] In other words, for every one million adults infected age 50 or younger, 999,500 of them will survive Covid-19.[25]

40.     Assuming the data regarding Covid-19 infections is accurate, the CDC's numbers show Americans across the board are far more likely to die of something other than Covid-19, which casts considerable doubt on the Defendant's assertions that all employees should be vaccinated due to business necessity.[26]

---

[20] Wren Hann, et al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis*, ASM Journals/mBio/Vol.12, No. 1 (Feb.9, 2021) https://doi.org/10.1128/mBio.03647-20, available at https://journals.asm.org/doi/10.1128/mbio.03647-20?permantly+true&.
[21] *Id.*
[22] Heritage Foundation, *COVID-19 deaths by age* (Feb. 17, 2021) available at https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/.
[23] CDC, *COVID-19 Pandemic Planning Scenarios* (Mar. 19, 2021) available at https://www.cdc.gov/oronavirus/2019-ncov/hcp/planning-scenerios.html.
[24] *Id.*
[25] *Id.*
[26] Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male,* NATURE (Aug. 28, 2020) (demonstrating that individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in

41.     The Defendant already employs a very successful method of preventing Covid-19 spread from the symptomatic – self-quarantine. The Defendant's vaccine mandate only addresses one risk: asymptomatic lethal spread. The problem with the Defendant's mandate is two-fold: first, asymptomatic lethal spread is significantly less of a threat than the Defendant seems to assert,[27] and second, testing more effectively, and easily, suffices rather than forced injections of unwanted experimental, potentially life-altering drugs developed in ways that offend the Plaintiff's religious beliefs or discriminates against her because of her sincerely held religious beliefs.

42.     The Defendant uses the specter of "asymptomatic spread" – the notion that fundamentally healthy people could transmit Covid-19 to others without having any symptoms of Covid-19 – to justify its vaccine mandate. But there is little credible scientific evidence that demonstrates the phenomenon of "asymptomatic spread" poses any meaningful danger to employees or anyone else for that matter. Indeed, it is "very rare" even according to Anthony Fauci, and, at worst, poses a one-in-a-million risk of lethal spread. The Defendant's response to Covid-19 is predicated, in part, on the flawed assumption that asymptomatic individuals pose a meaningful risk of spreading disease.

---

everyday life, such as driving a car) available at https://www.nature.com/articles/d41586-020-02483-2.

[27] Michael A. Johansson, et al., *SARS-CoV-2 Transmission from People Without COVID-19 Symptoms,* JAMA Netw. Open, 2021; 4(1):e2035057 (Jan. 7, 2021) http://doi.10.1001/Jamanetworkopen.202.35057, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707. *See also* Kenneth McIntosh, et al., *COVID-19: Epidemiology, Virology, and Prevention,* WoltersKluner (Jan. 13, 2022) available at https://www.uptodate.com/contents/covid-19-epidemiology-virology-and-prevention#H3392906512.

43.     Evidence of transmission requires that an individual can be shown to be the source of infection for another person who then developed symptoms of a disease/illness.

44.     Basic microbiology shows that infectiousness or transmission of viruses such as Covid-19 require an active infection resulting in elevated levels of viral replication in the host and shedding of the virus.[28]

45.     Decades of research demonstrates that symptomatic people, such as those coughing, sneezing, and wheezing, are the real drivers of viral spread, a fact Dr. Anthony Fauci initially acknowledged during the early days of the pandemic when he told the press, "[E]ven if there is some asymptomatic transmission, in all the history of respiratory-born viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver is always a symptomatic person." [29]

46.     When the viral replication process is blocked by a healthy immune system, the virus is neutralized, preventing significant viral replication and shedding. This occurs in approximately half the people exposed to the virus. Their immune system's defenses effectively ward off Covid-19 before it can take hold and cause symptomatic disease. Research demonstrated that asymptomatic people are not the drivers of Covid-19 transmission as demonstrated in the following points.

---

[28] *See generally*, Samuel Baron, et al., *Medical Microbiology* (4th ed. 1996) available at: https://www.ncbi.nlm.nih.gov/books/NBK8149/. *See also* Hitoshi Kawasuji, et al., *Transmissibility of COVID-19 depends on the viral load around onset in adult and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0243597.

[29] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China*, Press Briefing (Jan. 28, 2020) available at https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2642s

47.     Researchers studying real-world laboratory samples of more than a quarter-million people found that even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[30]

48.     A research article published in the CDC's *Emerging Infectious Diseases* journal notes that little to no transmission of Covid-19 occurred from asymptomatic people studied by research in Germany.[31] The researchers note: "The fact that we did not detect any laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with multiple studies . . ."[32] The lack of scientific and medical evidence surrounding asymptomatic spread led the researchers to conclude that asymptomatic spread is "unlikely to substantially spread COVID-19."[33]

49.     A review in March 2021 of all the published meta-analysis on asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals that in many cases, the same few studies have been recycled repeatedly to support the flawed proposition that those who are asymptomatic pose a real danger.[34] In the words of Allyson M. Pollock, a professor of public health at Newcastle University in the United Kingdom,

---

[30] Andreas Stang, *The Performance of the SARS-CoV-2-RT-PCR Test as a Tool for Detecting SARS-CoV-2 Infection in the Population,* 83 J. Infect. 2 (Aug. 2021), https://doi:10.10161j.jinf.2021.05.022  available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8166461/.

[31] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020,* 27 Emerging Infectious Diseases 4 (April 2021) available at https://www.cdc.gov/cid/article/27/4/20-4576_article.

[32] *Id.*

[33] *Id.*

[34] *See* John Lee, *Asymptomatic spread: who can really spread COVID-19,* Health advisory & Recovery Team (Mar. 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf.

"[s]earching for people who are asymptomatic yet infectious is like searching for needles that appear and reappear transiently in haystacks, particularly when rates are falling."[35]

50.    Moreover, according to FDA, there is insufficient data to determine the vaccines authorized for emergency use actually prevent asymptomatic infection or the transmission of SARS-CoV-2, the virus that causes Covid-19.[36]

51.    Recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[37]

52.    The Defendants' vaccine mandate "accommodation" – limiting asymptomatic unvaccinated employees from its workplace by effectively terminating them – flies in the face of the current scientific literature, which shows asymptomatic spread of Covid-19 is virtually non-existent.

53.    In sum, little objective evidence exists to support a finding that asymptomatic spread is a driver of Covid-19 and, therefore, poses a danger to the Defendant's workplace. Rather, the epidemic spread of Covid-19 is propelled almost exclusively by symptomatic persons (many of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

---

[35] Allyson M. Pollock, *Asymptomatic Transmission of Covid-19,* BMJ (Dec. 21, 2020) available at https://www.bmj.com/content/371/bmj.m4851.

[36] FDA, *Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions,* (Nov. 19, 2020) available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions.

[37] *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?",* WASHINGTON POST (Jul. 28, 2021) available at https://www.washingtonpost.com/health/breakthrough-infections-cdc-data/2021/07/28/dcaaa6b2-efce-11eb-a452-4da5fe48582d_story.html.

54.     A reasonable accommodation to vaccination is not to place perfectly healthy workers on unpaid status, and further to ban them from the workplace indefinitely or permanently. The Defendant's vaccine mandate is nonsensical, unjust, and a violation of federal and state law.

55.     The government-operated Vaccine Adverse Event Reporting System ("VAERS") database is intended to function as an "early warning" system for potential health risks caused by vaccines. Presently, VAERS is broadcasting a red alert, but the Defendant is refusing to take account this important data of adverse reactions to the vaccines and instead is barreling down the tracks of forced vaccination at full steam.

56.     Recent data presents an alarming picture. As of November 18, 2022, there have been 32,370 deaths reported to VAERS from Covid-19 vaccines, compared to just 8,673 for the preceding 30 years for all other vaccines.[38]According to Josh Guetzhow, Ph.D., there are 91 times the number of deaths and 276 times the number of coagulopathy events reported after Covid-19 vaccination than after flu vaccination. [39]

57.     Moreover, new research suggests the heightened risk of adverse effects results from "preexisting immunity to SARS-CoV-2 [that] may trigger intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals," establishing individuals who have suffered from Covid-19 and recovered, and are forced to vaccinate, are likely to experience those adverse events the government deemed as "rare".

[38] Josh Guetshow, *Safety signals for COVID vaccines are loud and clear. Why is Nobody Listening?* THE DEFENDER (Sept. 29, 2021) available at https://childrenshealthdefendse.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/.
[39] *Id.*

16

58.     Although the number of VAERS reports is alarming in its own right, it is likely

the true number of adverse effects associated with the Covid-19 vaccines far exceeds cases

reported to VAERS. In 2010, a federal study commissioned by the U.S. Health and Human

Services and performed by Harvard University consultants on behalf of the Agency for Health

care Research and Quality ("AHRQ") found that "fewer than 1% of vaccine adverse events" are

ever reported to VAERS.[40] Thus, it is likely that scores of adverse events associated with the

Covid-19 vaccines, including deaths, go unreported.

59.     It is not just VAERS that is broadcasting a red alert. On October 1, 2021, the

European Union's drug regulator, the European Medicines Agency ("EMA"), identified a new

possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's

Covid-19 vaccine.[41] The EMA said the new, possibly life-threatening clotting condition known

as venous thromboembolism ("VTE") should be included on the Johnson & Johnson product

label as a possible side-effect of the shot.[42]

60.     What is more, the Moderna and Pfizer vaccines are made with polyethylene

glycol ("PEG") and Johnson & Johnson uses a similarly problematic ingredient: polysorbate.[43]

PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is the delivery

---

[40] Ross Lazerus, et al. *Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS),* Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov./sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf.

[41] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharmaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/.

[42] *Id.*

[43] CDC, *COVID-19 Vaccines for People with Allergies* (Dec. 14, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/specific-groups/allergies.html.

mechanism to the cells that keeps the mRNA from dispersing and not reaching its intended target. PEG performs its intended use. Unfortunately, about 70% of the U.S. population is slightly to somewhat allergic to PEG. The National Institute of Health ("NHI") recently began a clinical trial of "systematic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19 vaccines" due to the recipients of those vaccines experiencing anaphylaxis.[44]

61.     According to the CDC, individuals who are allergic to PEG should not take the Moderna or Pfizer vaccines, and those who are allergic to polysorbate should not take the Johnson & Johnson vaccine.[45]

62.     Despite this known risk, the Defendant is not offering PEG allergy testing pre-vaccination and are not offering any indemnity or disability coverage from any of the known and potential adverse effects of the Covid-19 vaccines.

63.     To summarize, the potential adverse effects Plaintiff faced in being coerced to receive the Covid-19 vaccines pursuant to the Defendant's vaccine mandate is not theoretical, hypothetical or academic – they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the Covid-19 vaccines, subjecting Plaintiff to vaccination exposes them to a variety of health risks ranging from headaches and blood clots to death.

**The Defendant improperly refused to grant the Plaintiff's religious exemption in violation of Title VII and O.R.C. § 4112.12**

A.    The Defendant's improper conduct regarding the vaccine mandate policy and procedures and its communications with the Plaintiff regarding her request for a religious exemption.

64.     On September 9, 2021, the Defendant announced its vaccination policy,

---

[44] NIH, *NIH begins study of allergic reactions to Moderna, Pfizer-BioNTech COVID-19 vaccines* (Apr. 7, 2021) available at https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines.
[45] *See id.* at note 43.

entitled "Introducing the Scripps COVID-19 vaccination policy". *See* **Exhibit A**.

> We understand some employees may have a medical reason or sincerely held religious belief for not getting the vaccine, and we will have an accommodation process for those employees.

> Otherwise, employees must be fully vaccinated by Dec. 1, including employees who work 100% remotely. If not, the employee will be in violation of our safety policy, and this will end their Scripps employment. . .

65.     The mandate did not address, at all, the procedures for seeking a religious exemption from the mandate.

66.     Instead, employees were shuffled to a "Frequently Asked Questions" document, (attached hereto as **Exhibit C**) which stated employees must "contact your HR business partner by Sept. 24 to initiate a [sic] request an exemption" and were then to be given another deadline by their HR business partner by which to submit the request for religious exemption to the Defendant. When requesting a religious exemption, that second deadline was a mere three business days, because according to the Defendant, "all that is required is a written statement from the employee in his or her own words." *Id.*

67.     In response to the question "are medical or religious exemptions automatically granted?", the Defendant provided the following explanation:

> No. Each request is reviewed on a case-by-case basis. In addition to reviewing whether an exemption is warranted for medical or religious reasons, Scripps must also consider whether granting an exemption poses a direct threat to the health or safety of others or creates an undue burden on Scripps.

68.     The "Frequently Asked Questions" also states that an employee granted an accommodation may be required to follow additional safety procedures such as wearing personal protection equipment, required testing or self-quarantining. *See id.*

69.     On September 13, 2021, Ms. Teets filled out the Defendant's required forms along with an extensive and thorough explanation of her sincerely held religious beliefs and how

those beliefs precluded her from being required to take the Covid-19 vaccine.  (attached here as **Exhibit D**).

70.    Ms. Teets' exemption request clearly states that the use of aborted fetal cells in the development, and/or testing, and/or manufacturing of a product is against her sincerely held religious exemptions and that the body is defiled according to her sincerely held religious beliefs by taking any of the Covid-19 vaccines.

71.    The Defendant denied Ms. Teets' exemption request via email (Attached here as **Exhibit E),** with the claim that "The information provided does not demonstrate that the religious belief asserted supports being unable to get the vaccine or that the belief is "sincerely held," as required by law."

72.    The EEOC provides specific, clear, and perfectly on-point guidance on how a religious exemption request under Title VII is to be evaluated in the document:  "What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws" (EEOC guidelines) the EEOC provides rules on how a religious exemption to the Covid-19 vaccine should be evaluated.  In Section L.2 it states:

> Generally, under Title VII, an employer should proceed on the assumption that a request for religious accommodation is based on sincerely held religious beliefs, practices, or observances.  However, if an employer **has an objective basis** for questioning either the religious nature or the sincerity of a particular belief, the employer would be justified in making a limited factual inquiry and seeking additional supporting information.[46] (emphasis added).

73.    The Defendant provided no objective basis for their conclusion even though Ms. Teets asked for clarification as to how the Defendant made their conclusions in multiple emails as detailed below.

---

[46] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L

74.     The clearest statement that proves the Defendant's actions were in violation of

Federal Law is the unambiguous statement from the EEOC guidelines from section K.12 where

it states:

> Once an employer is on notice that an employee's sincerely held
> religious belief, practice, or observance prevents the employee from
> getting a COVID-19 vaccine, the employer **must** provide a reasonable
> accommodation unless it would pose an undue hardship." (emphasis
> added)

EEOC guidance explains that the definition of religion is broad and protects:

> beliefs, practices, and observances with which the employer may be
> unfamiliar.  Therefore, the employer should ordinarily assume that an
> employee's request for religious accommodation is based on a sincerely
> held religious belief, practice, or observance.

75.     The Defendant never claimed that providing Ms. Teets a religious exemption to

the Covid-19 vaccine would have been an undue burden to the Defendant.

76.     Upon receiving her exemption denial, Ms. Teets was shocked and unable to

understand the reasoning behind the Defendant's decision. As a result, she emailed Cecilia Parra,

Human Resources Business Partner, on October 14, 2021 to try to understand how the Defendant

concluded that her religious exemption failed to meet the as to then undefined requirements. The

Defendant responded On October 26, 2021 basically restating the conclusory statement that Ms.

Teets was provided when her exemption was denied. Ms. Parra provided no additional details, no

objective basis for questioning Ms. Teets' exemption request, nor any reasoning whatsoever to

support the Defendant's decision. (Attached here as **Exhibit F**).

77.     The only new information that was provided to Ms. Teets stated: "while you

may have sincerely-held religious beliefs, the review committee finds the information

provided does not support that you are unable to receive the COVID-19 vaccine due to

21

those beliefs." **Id**. In the initial denial the Defendants claimed that Ms. Teets' religious

beliefs were not sincerely held. Hence, after this clarification the Defendant relies on the

conclusion that her sincerely held religious belief is not enough to allow her to remain

unvaccinated.

78.     The rest of the email is a clear cut and past job reiterating company policy

without providing any opportunity to understand how that company policy was applied.

*See* **Id.**

79.     The Plaintiff responded in confusion, as the email on October 26, 2021, contained

no relevant information and did not answer the Plaintiff's earlier questions. As a result, Ms. Teets

once again reached out to Ms. Parra for clarification via email (attached here as **Exhibit G**),

asking specifically: "I would like to know specifically why I was denied an accommodation that

would have prevented my termination.  I am a 100% remote employee.  I am happy to test on a

weekly basis, at my own expense, and provide the results to Scripps."

80.     Instead of Ms. Para engaging in an exchange of ideas and information she merely

regurgitated the same information but added "No further information will be provided." **Id.**

81.     In a last-ditch effort, Ms. Teets was able to secure a phone call on October 28,

2021 that turned into an exercise in Ms. Teets justifying her beliefs instead of Ms. Teets being

given an opportunity to learn how conclusions were made in denying her exemption request.

82.     In that interview the Plaintiff was told that the review committee determining

whether a religious exemption often denied requests for exemptions because it does not have

enough information to properly evaluate the request.

83.     Ms. Teets was asked to explain how her faith led her to request an exemption

from the vaccine mandate.

84. Ms. Teets reiterated the statements she made in writing requesting the exemption and discussed in detail her long-standing, sincerely held beliefs about abortion and the use of any medical products containing fetal cell lines from aborted fetuses. She provided the names of coworkers and administrators who knew about the veracity of her sincerely and long-held beliefs.

85. The employee interviewer repeatedly tried to challenge the Plaintiff's sincerely and long-held beliefs against abortion, which were openly espoused prior to the advent of Covid-19 and communicated to coworkers and the Defendant's CEO.

86. The employee interviewer did not seek to determine the veracity of the Plaintiff's sincerely held beliefs; rather the employee interviewer attempted to challenge the Plaintiff's sincerely held beliefs so as to avoid granting the religious exemption.

87. Again, the Plaintiff confirmed that if she received an exemption, she would comply with other safety requirements, such as masking and testing for Covid-19.

88. The Plaintiff was terminated via departure memo dated November 29, 2021 for "due to noncompliance with the Scripps Covid-19 vaccination policy." (Attached here as **Exhibit H**).

89. No meaningful review of the Defendant's conduct in evaluating the request was ever conducted.

90. The Plaintiff worked 100% remotely for the Defendant. Moreover, the Defendant and the Plaintiff intended her position to remain remote moving forward. Upon information and belief, the Defendant, advertising for the Plaintiff's replacement, states the job will be 100% remote with 0% travel.

91.     Upon information and belief, the Defendant maintained a masking policy throughout this time period.

92.     Upon information and belief, the Defendant denied all requests for religious accommodations.

93.     Plaintiff believes any benefit the Covid-19 vaccines may confer, flows from the unjust exploitation of unborn human life. Plaintiff refuses on religious ground to accept or be forced to accept the Covid-19 vaccines.

94.     Plaintiff objects to receiving the Covid-19 vaccine because she is a Christian, her body is the temple of the Holy Spirit and, as a Christian, she is compelled to protect her body from defilement. Insofar as the Covid-19 vaccines also contain neurotoxins, hazardous substances, attenuated virus, animal parts, foreign DNA, albumin from human blood, carcinogens and chemical wastes that a proven harmful to the human body, the Plaintiff finds the taking of the vaccine to be in direct conflict with her Christian duty to protect her body as the temple of the Holy Spirit.

B.  Scientific support for the Plaintiff's sincerely held beliefs.

95.     At the time of Ms. Teets' termination, all Covid-19 vaccines utilized either in production or testing of fetal cell lines developed from tissues originally derived from aborted fetuses.[47] For example, the Johnson & Johnson vaccine used fetal cells cultures, specifically PER. C6, a retinal cell line that was isolated from terminated fetus in 1985.[48]

---

[47] *See* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, https://publichealth.lacounty.gov/media/coronavirus/docs/vaccine/vaccinedevelopment_fetalcelllines.pdf.
[48] *Are the vaccines made with fetal cells,* Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-aq/are-the-mma-vaccines-made-with-fetal-cells.

24

96.     As for the EUA-Pfizer and Moderna Covid-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[49] All HEK 293 cells are descended from tissue taken in 1973 from either an elective abortion or miscarriage that took place in the Netherlands. [50]

C.  Federal law and State law prohibiting religious discrimination.

97.      Title VII prohibits the Defendant from discriminating against employees based on their religion. This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

98.     Title VII "imposes upon employers a 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of undue hardship." *Reed v. International Union, United Automobile, Aerospace and Agricultural Implement w\Workers of America*, 569 F.3d 576, 579 (6th Cir. 2009).

99.     A prima facie case of religious discrimination based on a failure to accommodate requires a plaintiff to show "(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the [defendant's] attention, and (3) the religious practice was the basis for the adverse employment decision." *E.E.O.C. v. Union Independiente de la Autoridad de Acuductos y Alcantarillados de Puerto Rica*, 279 F.3d 49, 55

---

[49] *See* Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contained aborted fetal cell?,* available at https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells.
[50] *See* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, https://publichealth.lacounty.gov/media/coronavirus/docs/vaccine/vaccinedevelopment_fetalcelllines.pdf.

(1st Cir. 2002). *See also Reed,* 569 F. 3d at 579 (6th Cir. 2009); *Smith v. Pyro Mining Co.,* 827 F.2d 1081 (6th Cir. 1987) A "bona fide religious practice" or belief is one that is "religious and sincerely held." *Id.* Title VII's definition of religion includes "all aspects of religious observance and practice, as well as belief." *Id.,* citing 42 U.S.C. § 2000e(j). Further 29 C.F.R. § 1605.1 states that religious practices include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious values." Section 2000e(j) "leaves little room for a party to challenge the religious nature of an employee's professed beliefs." *Union Independiente*. Religious beliefs are not required to be "acceptable, logical, consistent, or comprehensible to others," and that interfaith differences as to what is scripturally acceptable are "not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.*

100.     Ms. Teets carried each of these elements as outlined throughout this complaint. Specifically:

   a.   Her religious practice of not putting anything into her body that in part came from aborted fetal cells conflicted with Defendant vaccine policy,

   b.   Ms. Teets put Defendant on notice via both of her submitted forms. *See* **Exhibit D**; and

   c.   The Defendant's failure to consider her sincerely held religious beliefs, and how they conflict with the Defendant's policies, resulted in Ms. Teet's termination.

101.     Once an employee has made out a prima facie case of discrimination, the

26

employer must show that it offered a reasonable accommodation, or that reasonable accommodation would be an undue burden. *Stanley v. Lawson Co.,* 993 F. Supp. 1084 (N.D. Ohio 1997).

102.    "An employer must . . . present evidence of undue hardship" and not "rely merely on speculation," *Smith v. Pyro Min. Co.,* 827 F.2d 1081, 1085-86 (6th Cir. 1987), and the lack of substantive content in the Defendant's justification here demonstrates that the Defendant cannot show undue hardship.

103.    Merely stating that there is increased risk to the workplace and employee safety without explaining why and without providing evidentiary support cannot be sufficient to meet the Defendant's obligation under Title VII to establish undue hardship. Establishing "undue hardship" requires assessment of actual circumstances at the employer's place of business and of proposed and potential accommodations, and the Defendant's rote justification demonstrates that the Defendant did not do the work of assessing undue hardship. *See id.*

104.    Additionally, in Ms. Teets' case specifically, she was 100% remote and therefore could not have provided any burden to any employee whatsoever.

105.    Undue hardship analysis must start with an analysis of proposed accommodations. The Defendant did not identify potential accommodations. Therefore, the Defendant did not reach the first step of analyzing accommodations. An employer violates Title VII if it fails to attempt as accommodation after accommodation is requested. *EEOC v. Arlington Transit Mix, Inc.,* 957 F.2d 219, 222 (6th Cir. 1991) ("[a]fter failing to pursue [a voluntary waiver of seniority rights] or any other reasonable accommodation, the company is in no position to argue that is was unable to accommodate reasonably [plaintiff's] religious needs without

undue hardship."); *EEOC v. Ithaca Indus., Inc.,* 849 F.2d 116 (4th Cir. 1988) *cert denied* 488 U.S. 924 (1988) (same).

106.    An employer must demonstrate attempted accommodation before it claims undue hardship as a defense. *See, e.g., Redmond v. GAF Corp.,* 574 F.2d 897, 901-02 (7th Cir. 1978); *Shaffeld v. Northrop Worldwide Aircraft Serv., Inc.,* 373 F. Supp. 937, 944 (M.D. Ala. 1974). The Defendant's justification for denying the Plaintiff's requests for religious exemptions demonstrates that it did not consider potential accommodations.

107.    Moreover, the Defendant clearly could have considered accommodations as dictated by the EEOC. The EEOC guidelines referenced above also provides examples of reasonable accommodations or modifications that employers may have to provide to employees who do not get vaccinated due to religious beliefs, practices, or observance. Reasonable accommodations the EEOC has identified as potentially not imposing an undue hardship on the employer include requiring the unvaccinated employee entering the workplace to:

(1) wear a face mask,

(2) work at a social distance,

(3) work a modified shift.

(4) get periodic tests for COVID-19,

(5) be given the opportunity to telework, or

(6) accept a reassignment.

*EEOC COVID-19 Guidance,* K.2.

108.    Beginning in March 2020, the Defendant had the opportunity to test many relevant accommodations for its employees, including daily assessments of personal health and potential exposure, telework, targeted Covid-19 testing, protocols requiring non-work when

symptomatic or potentially exposed to Covid-19, contact tracing, handwashing and hygiene, and the use of PPE.

109.    Such accommodations are understood to have prevented any substantial or material transmission of Covid-19 when used.

110.    The Defendant's vaccine mandate provided employees the illusory ability for Ms. Teets to obtain a religious exemption to the vaccine.

111.    The review committee denied the Plaintiff's request for religious accommodation with the following generic and conclusory reply: "the review committee finds the information provided does not support that you are unable to receive the COVID-19 vaccine due to those beliefs." **Exhibit E**.

112.    The Defendant never told the Plaintiff how she had failed to demonstrate her beliefs were not sincerely held.

113.    During the October 29, 2021 phone call, the Defendant improperly asserted and implied that the Plaintiff's religious beliefs were insincere by making vague allegations about medical products the Plaintiff has not taken to shame, demean, and harass the Plaintiff.

114.    The Defendant unlawfully purported to judge as invalid the religious beliefs of the Plaintiff who objected to the vaccines' indisputable connection to aborted fetal cell lines.

115.    The Defendant made no attempt to accommodate the Plaintiff's request for religious exemption, despite the fact that her job was 100% remote and she was willing to comply with other safety precautions.

116.    The Defendant made no showing, nor ever even attempted to claim, that providing the Plaintiff the requested exemption was an undue burden.

117.    The Defendant did not dispute that each of the Covid-19 vaccines

29

currently available in the United States were developed or tested using cell lines derived from aborted babies.

118.    The Defendant did not engage the Plaintiff in a give and take discussion about potential accommodations. Plaintiff's willingness to comply with other safety measures were ignored.

119.    To the extent that the Defendant engaged in any communication with the Plaintiff about her request for religious accommodation, that communication was solely limited to trying to make the Plaintiff change her mind about her request, or shaming the Plaintiff for her beliefs or playing a game of "gotchya" where the Defendant tried to find a scenario where Ms. Teets may have taken an over-the-counter medication that unbeknownst to her used aborted fetal cells as a part of the medicines development.

120.    It is well established that Title VII and O.R.C. § 4112 "have the same evidentiary standards and general analysis." *Gibbons v. Bair Foundation,* No. 1:04CV2018, 2007 WL 582314, at 4-5 (N.D. Ohio Feb. 20, 2007) citing *Greene v. St. Elizabeth Hosp. Med. Ctr.,* 134 F.3d 371, 1998 WL 13410, at 5 (6th Cir. 1998).

121.    Given these facts, the Defendant's vaccination policy is vastly overreaching and unnecessarily violated federal and state law.

<u>**COUNTS**</u>

**COUNT ONE**

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**Religious Discrimination-Failure to Accommodate**

122.    Plaintiff restates the foregoing paragraphs as if set forth fully herein.

123.    At all times relevant, Plaintiff was Defendant's "employee" within the meaning of 42 U.S.C. § 2000e(f).

124. At all times relevant, the Defendant was Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b).

125. Plaintiff holds sincere religious beliefs that preclude her from receiving a Covid-19 vaccine.

126. Plaintiff informed her employer, the Defendant, of those beliefs and requested religious accommodations from the Defendant's vaccine mandate.

127. The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with questions designed to challenge the sincerity of Plaintiff's religious beliefs. The Defendant failed to provide the Plaintiff with reasonable accommodations for her religious belief, instead terminating her for failing to violate her sincerely held beliefs and obtain a vaccination.

128. The Defendant thereby discriminated again the Plaintiff because of her religious beliefs.

129. By failing to engage in the interactive process or offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

130. It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

131. The Defendant illegally and improperly did not identify potential

31

accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show undue hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs and no undue burden exists here regardless.

132.    By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemption, the Defendant violated Title VII. And this violation has harmed and continues to harm Plaintiff.

133.    Due to the Defendant's improper and willful, intentional and unlawful actions and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

### COUNT TWO

### Violation of O.R.C. § 4112, *et seq.,*
### Religious Discrimination-Failure to Accommodate

134.    Plaintiff restates the foregoing paragraphs as if set forth fully herein.

135.    Plaintiff holds sincere religious beliefs that preclude her from receiving a Covid-19 vaccine.

136.    Plaintiff informed her employer, the Defendant, of those beliefs and requested religious accommodations from the Defendant's vaccine mandate.

137.    The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with questions designed to challenge the sincerity of Plaintiff's religious beliefs. The Defendant failed to provide the Plaintiff with reasonable accommodations for her religious belief, instead terminating her for failing to violate her sincerely held beliefs and obtain a vaccination.

138.    The Defendant thereby discriminated again the Plaintiff because of

32

her religious beliefs.

139.    By failing to engage in the interactive processor offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of O.R.C. § 4112, *et seq.*

140.    It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

141.    The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show undue hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs and no undue burden exists here regardless.

142.    By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemption, the Defendant violated O.R.C. § 4112, *et seq.* And this violation has harmed and continues to harm Plaintiff.

143.    Due to the Defendant's improper and willful, intentional and unlawful Actions, conducted with malice and aggregated and egregious fraud, and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A. Payment for all economic damages, including, but not limited to, back pay, front pay and benefit in amounts to be determined at trial;

B. Compensatory and consequential damages, and all non-economic damages, including for emotional duress;

C. Punitive damages;

D. Statutory damages;

E. Pre-judgment and post-judgment interest at the highest lawful rate;

F. An award of reasonable attorneys' fees, costs and expenses of all litigation to the extent allowable under federal and state law; and

G. Such other relief as the Court deems just and proper.

Respectfully submitted,

/s/Glenn D. Feagan_____
Glenn D. Feagan (#0041520)
Deters Law
5247 Madison Pike
Independence, Ky 41051
(859) 363-1900
(216) 937-2222
(216) 592-8784
gfeagan@feaganlaw.com
Attorney for the Plaintiff